[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/29/99
THOMAS K. KAHN
CLERK**

_____

No. 98-3367

_____

D. C. Docket No. 89-CV-1638

WAYNE TOMPKINS,

Petitioner-Appellant,

versus

MICHAEL W. MOORE, Secretary,
Florida Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 29, 1999)

Before COX, CARNES and HULL, Circuit Judges.

CARNES, Circuit Judge:

Wayne Tompkins was convicted and sentenced to death for the sexual battery and murder of Lisa DeCarr, age fifteen, who was the daughter of Tompkins' girlfriend. The facts concerning the crime and the evidence against Tompkins are set out in the Florida Supreme Court's decision affirming on direct appeal his conviction and death sentence. See Tompkins v. State, 502 So.2d 415 (Fla. 1986). After conducting an evidentiary hearing, the Florida trial court denied Tompkins' motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850. The Florida Supreme Court affirmed that denial, and it also denied Tompkins' state habeas petition in the same opinion. See Tompkins v. Dugger, 549 So.2d 1370 (Fla. 1989).

After exhausting his state remedies, Tompkins filed a petition for federal habeas corpus relief pursuant to 28 U.S.C. § 2254. The United States District Court for the Middle District of Florida denied that petition in a thorough, unpublished opinion. See Tompkins v. Singletary, No. 89-1638-CIV-T-21B (M.D. Fla. April 17, 1998). This is Tompkins' appeal from that denial.

THE CERTIFICATE OF PROBABLE CAUSE

After the district court denied his habeas petition, Tompkins filed an application for a certificate permitting him to appeal. Because the federal habeas petition had been filed before the April 24, 1996 effective date of the Anti-

2

terrorism and Effective Death Penalty Act ("AEDPA"), a certificate of probable cause under pre-AEDPA law, instead of a certificate of appealability under post-AEDPA law, see 28 U.S.C. § 2253(c), was the proper procedural route for permission to appeal. See Hardwick v. Singletary, 122 F.3d 935 (11th Cir.), modified on rehearing, 126 F.3d 1312 (11th Cir. 1997). The district court recognized as much, and it also recognized that in issuing a certificate of probable cause – unlike a certificate of appealability – it need not specify the issues for which the necessary showing to permit the appeal had been made. Nonetheless, the court decided "in view of Petitioner's numerous claims, [to] specify the issues so certified." The court issued a certificate of probable cause only as to two claims in their entirety and parts of two other claims. The remaining 25 or so other claims Tompkins had raised in the district court were left out of the certificate of probable cause.

Tompkins wants us to review the district court's denial of relief as to far more claims than the certificate of probable cause specifies; indeed, he wants review of most of the many claims he raised in his habeas petition. The problem is that Tompkins did not even attempt to broaden the certificate of probable cause to cover all those other claims. He could have filed an application in this Court to do

3

that, but he did not. The reason, Tompkins explains, is that he did not think it was necessary to do so in view of this Court's Hardwick decision.

In the Hardwick case, the district court had mistakenly believed the habeas case before it was governed by AEDPA, including the requirement that a certificate of appealability specify the issues as to which an appeal is being permitted. So, the district court issued a certificate of appealability specifying some but not all of the issues the petitioner wanted to appeal. This Court determined that the case was actually governed by pre-AEDPA law, see Hardwick, 122 F.3d at 936, which included provision for issuance of a certificate of probable cause to appeal that need not – and almost never did – specify the issues as to which an appeal was permitted; certificates of probable cause to appeal were almost always issued as to cases considered as a whole. What we decided to do in that particular instance was to construe the order granting a certificate of appealability as to some but not all issues as a certificate of probable cause as to all the issues and let the whole appeal go forward on that basis. See Hardwick 126 F.3d at 1313. Tompkins says Hardwick controls the present situation.

We do not think so. This is not a case, like Hardwick, where the district court judge was laboring under the mistaken belief that he was required to grant a certificate specifying issues worthy of appeal and was unaware he could grant a

4

general certificate covering the whole case without making an issue-by-issue determination. Judge Nimmons, who presided over this case in the district court, made it clear in his order granting a certificate of probable cause to appeal that he knew exactly what was going on. He said in that order that this was a pre-AEDPA case governed by the certificate of probable cause to appeal rules, and that under those rules he was not required to specify which issues were worthy of being reviewed on appeal. Fully aware that he was not required to specify issues in the certificate of probable cause to appeal, Judge Nimmons nonetheless chose to do so in order to assist this Court and the parties in shaping up the appeal.

It is certainly unusual for a certificate of probable cause to appeal to specify and limit the issues as to which the appeal is being permitted. Indeed, that is one of the differences between the old certificate of probable cause to appeal and the new certificate of appealability provision in AEDPA: the new provision requires specification of issues, see 28 U.S.C. § 2255(c)(3). But unusual does not equate with impermissible. On at least two occasions, we have permitted district courts to specify issues covered by certificates of probable cause to appeal, and we have honored the resulting limitation on the scope of the appeal. See Clisby v. Alabama, 52 F.3d 905, 906 (11th Cir. 1995); Clark v. Dugger, 901 F.2d 908, 910 (11th Cir. 1990). Tompkins points out that both of those decisions involved appeals from the

denial of relief in second petition cases, but nothing in either the <u>Clisby</u> or the <u>Clark</u> opinion  hints at such a distinction, nor is there any persuasive reason for distinguishing  first from second petition cases  insofar as certificates of probable cause to appeal are concerned.

But what about the more recent <u>Hardwick</u> case and that panel's decision to treat a mistaken certificate of appealability on fewer than all of the issues as a certificate of probable cause to appeal all the issues?  There are two possibilities.  One is that <u>Hardwick</u> is distinguishable from <u>Clisby</u> and <u>Clark</u>, and in turn from the present case, on the basis that <u>Hardwick</u> involved mistaken district court action, not action taken with eyes wide open.  The second possibility is that <u>Hardwick</u> is not distinguishable from <u>Clisby</u> and <u>Clark</u> on that basis (or any other we can think of),  which means that we are duty bound to follow the decisions in the earlier two cases instead of the more recent one in <u>Hardwick</u>. <u>See</u> <u>United States v. Steele</u>, 147 F.3d 1316, 1318 (11th Cir. 1998)(en banc)("[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court.") (quoting <u>United States v. Hogan</u>, 986 F.2d 1364, 1369 (11th Cir. 1993)); <u>United States  v. Dailey</u>, 24 F.3d 1323, 1327 (11th Cir. 1994)("When there is no method for reconciling an intracircuit conflict of authority, the earliest

6

panel opinion resolving the issue in question binds this circuit until the court resolves the issue en banc.")(internal quotation marks and citation omitted). Either way, the <u>Hardwick</u> decision cannot rescue Tompkins from his predicament. The district court issued him a limited certificate of probable cause to appeal, and he failed to apply to this Court to have it broadened.

We would be fully justified in limiting our review to those issues specified in the certificate issued by the district court. The only reason we are not limiting our review in that manner is the <u>Hardwick</u> decision did engender some confusion, and we cannot say Tompkins' reliance upon it was entirely unjustified. So, we will review the issues argued in Tompkins' brief in the same fashion and to the same extent as if the district court had not limited the certificate of probable cause to appeal. We will review all of them.[1]

_____

[1]To say that we will review all of the issues Tompkins has raised in his brief is not to say that we will write to each one. All of them were discussed at some length by the district court, except Tompkins' contention that the district court should have ordered the grand jury proceedings transcribed, and we find no abuse of discretion in its declining to do so. The issues we do not write more about merit no further discussion here beyond the statement that we agree with the district court that the claims to which those issues are connected do not provide a basis for federal habeas relief in this case.

The issues on which we affirm the district court without further elaboration are those involving the following claims: denial of right to present defense and confront witnesses; <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194 (1963), violation; ineffective assistance of appellate counsel; <u>Massiah v. United States</u>, 377 U.S. 201, 84 S.Ct. 1199 (1964), violation; unreliable in-court identification; misinformed jury and judge; improper influences on the jury; improper argument and instruction error at the sentencing stage; and failure of the district court to order the grand jury proceedings transcribed.

But let this opinion serve as clear notice to any other habeas petitioners who have been granted limited certificates of probable cause to appeal. The limitations contained in those certificates will be honored to the same extent that the limitations in certificates of appealability issued in AEDPA-covered cases are. It is not enough simply to file a brief addressing all of the issues for which review is sought. See Murray v. United States, 145 F.3d 1249, 1250 - 51(11th Cir. 1998). Issues not covered in the certificate will not be considered. See id. The only way a habeas petitioner may raise on appeal issues outside those specified by the district court in the certificate is by having the court of appeals expand the certificate to include those issues. See generally Hunter v. United States, 101 F.3d 1565, 1575 (11th Cir. 1996)(en banc)("Under the plain language of the rule, an applicant for the writ gets two bites at the appeal certificate apple: one before the district judge, and if that one is unsuccessful, he gets a second one before a circuit judge."). An application to expand the certificate must be filed promptly, well before the opening brief is due. Arguments in a brief addressing issues not covered in the certificate, including any expansion granted by the court of appeals, will not be considered as a timely application for expansion of the certificate; those issues simply will not be reviewed. In other words, the same rules that apply to

certificates of appealability will henceforth be applied to certificates of probable cause to appeal that are limited to specified issues.[2]

## THE DENIAL OF AN EVIDENTIARY HEARING

Tompkins received an evidentiary hearing in state court on his Rule 3.850 petition, which raised much the same issues as he raised in his later federal habeas petition. The district court denied Tompkins an evidentiary hearing so he could present additional evidence in federal court, because he failed to show cause and prejudice for not presenting that evidence in the state court proceeding, a showing required under Keeney v. Tomayo-Reyes, 504 U.S. 1 (1992), 112 S.Ct. 1715 (1992). Such a showing should not have been required of him, Tompkins argues, because in his view Keeney's cause and prejudice test is not applicable where the state court held an evidentiary hearing. That view is incorrect.

Keeney itself involved a case in which an evidentiary hearing was denied in federal court after one had been held in state court. See id. at 4, 112 S.Ct. at 1716 ("After a hearing, the state court dismissed respondent's petition ...") Thus, the very decision announcing that the cause and prejudice test is applicable where the

_____

[2]We realize that as time goes on issues concerning certificates of probable cause to appeal will fade away, because there will be fewer and fewer appeals in which the habeas petition was filed before AEDPA's April 24, 1996 effective date. But there are now, and there will be arising on appeal in the near future, some more certificate of probable cause cases. We speak on the subject today for the benefit of the attorneys in those remaining cases, whatever their diminishing numbers may be.

federal petitioner had failed to develop material facts in a state court proceeding is itself authority for the proposition that the test applies when there has been an evidentiary hearing in state court. The <u>Keeney</u> rule has been applied many times in this context. <u>See</u>, <u>e.g.</u>, <u>Williams v. Turpin</u>, 87 F.3d 1204, 1208 (11th Cir. 1996); <u>Mills v. Singletary</u>, 63 F.3d 999, 1022 (11th Cir. 1995); <u>Mathis v. Zant</u>, 975 F.2d 1493, 1497 (11th Cir. 1992). The district court properly applied the <u>Keeney</u> rule with its cause and prejudice test, and the court did not err in concluding that Tompkins had failed to proffer adequate evidence of cause and prejudice ( or actual innocence, which is an exception to the cause and prejudice requirement).

THE GUILT STAGE INEFFECTIVE ASSISTANCE CLAIM

Tompkins contends that the performance of his trial counsel, Daniel Hernandez, was ineffective at the guilt stage. To prevail on that contention Tompkins must persuade us both that counsel's performance at the guilt stage was "outside the wide range of professionally competent assistance," <u>Strickland v. Washington</u>, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066 (1984), and also that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id</u>. at 694, 104 S.Ct. at 2052. A "reasonable probability" is one "sufficient to undermine confidence in the

10

outcome," id., which here is the jury's verdict convicting Tompkins of the capital offense.  We are not persuaded that either requirement has been met.

Tompkins' guilt stage ineffective assistance arguments are best viewed against a  background of the evidence the state presented against him.  That evidence is well summarized in the Florida Supreme Court's opinion affirming his conviction and sentence on direct appeal, and for the convenience of the reader we set forth that summary here:

> The victim, Lisa DeCarr, aged 15, disappeared from her home in Tampa on March 24, 1983. In June 1984, the victim's skeletal remains were found in a shallow grave under the house along with her pink bathrobe and jewelry. Based upon a ligature (apparently the sash of her bathrobe) that was found tied tightly around her neck bones, the medical examiner determined that Lisa had been strangled to death. In September 1984, Wayne Tompkins, the victim's mother's boyfriend, was charged with the murder.
>
> At trial, the state's three key witnesses testified as follows. Barbara DeCarr, the victim's mother, testified that she left the house on the morning of March 24, 1983, at approximately 9 a.m., leaving Lisa alone in the house. Lisa was dressed in her pink bathrobe. Barbara met Wayne Tompkins at his mother's house a few blocks away. Some time that morning, she sent Tompkins back to her house to get some newspapers for packing. When Tompkins returned, he told Barbara that Lisa was watching television in her robe. Tompkins then left his mother's house again, and Barbara did not see or speak to him again until approximately 3 o'clock that afternoon.  At that time, Tompkins told Barbara that Lisa had run away. He said the last time he saw Lisa, she was going to the store and was wearing jeans and a blouse. Barbara returned to the Osborne Street house where she found Lisa's pocketbook and robe missing but not the clothes described by Tompkins. Barbara then called the police.

11

The state's next witness, Kathy Stevens, a close friend of the victim, testified that she had gone to Lisa DeCarr's house at approximately 9 a.m. on the morning of March 24, 1983. After hearing a loud crash, Stevens opened the front door and saw Lisa on the couch struggling and hitting Tompkins who was on top of her attempting to remove her clothing. Lisa asked her to call the police. At that point, Stevens left the house but did not call the police. When Stevens returned later to retrieve her purse, Tompkins answered the door and told her that Lisa had left with her mother. Stevens also testified that Tompkins had made sexual advances towards Lisa on two prior occasions.

Kenneth Turco, the final key state's witness, testified that Tompkins confided details of the murder to him while they were cellmates in June 1985. Turco testified that Tompkins told him that Lisa was on the sofa when he returned to the house to get some newspapers for packing. When Tompkins tried to force himself on her, Lisa kicked him in the groin. Tompkins then strangled her and buried her under the house along with her pocketbook and some clothing (jeans and a top) to make it appear as if she had run away.

Tompkins v. State, 502 So.2d at 417 - 18.

The thrust of Tompkins' guilt stage ineffective assistance attack centers around his argument that trial counsel did not do enough to show that Lisa DeCarr was alive after the morning of March 24, 1983, the morning Tompkins was seen struggling with her on the couch in the house they shared with Lisa's mother, who was Tompkins' girlfriend. If she was alive after that morning, Tompkins argues, someone else must have killed her, and besides, the State would have failed to prove he had killed her before 5:00 p.m. that day, a requirement it undertook in the bill of particulars.

12

The main thing trial counsel could and should have done to show that Lisa DeCarr was alive after the morning in question, Tompkins says, is present evidence that a young woman named Wendy Chancey had seen her alive later in the day, had seen her getting into a vehicle, and had seen her wearing clothes similar in appearance to those Tompkins told the police Lisa had been wearing when she left the house unharmed that morning. Before trial, counsel learned from a police report that Chancey had told the police those things during an interview, and he considered using her as a witness. He decided not to do so because he believed she would not have made a good witness.

At the state court evidentiary hearing, Tompkins tried unsuccessfully to show that Wendy Chancey would have been a useful witness for the defense. The evidence at that hearing showed that when Chancey was located and interviewed twice by collateral counsel's investigator, that she had no recollection at all of having seen Lisa on the day in question, and that she could not even identify a photograph of Lisa. The investigator who interviewed her included in his report this observation and recommendation:

> This writer believes that Wendy Chancey is a troubled child who has been through many traumatic experiences, some of which may involve narcotics. It could well be that Wendy Chancey's past and possibly some unknown medical condition affects her ability of recall. Further attempts to interview this female are not recommended by this investigator.

There is no evidence in the record that at the time of the trial Wendy Chancey remembered anything about the events on the day in question, or that she even remembered Lisa DeCarr.

Tompkins faults trial counsel for not calling Wendy Chancey, anyway. He says she could have identified the statements referred to in the police reports as ones she had made, and she could have said that those statements were accurate when made even though she has no recollection of the events they describe. The argument is that testimony from Chancey – if she gave it – would have been enough to get those statements into evidence as prior recollections recorded. No, it would not have been enough, even assuming Chancey could have testified to the accuracy of the statements she could no longer recall. As the district court explained, under Florida law a prior recollection recorded is admissible only if the recorded statement is one that was recorded by the witness herself. See Fla. Stat. §90.893(5) ("A memorandum or record ... shown to have been made by the witness..."); Heindreth v. State, 483 So.2d 768, 769 (Fla. 1st DCA 1986)(police report's synopsis of a witness' statements to an officer not admissible as prior recollection recorded).

Tompkins has not shown that there is any basis for the admission of that part of the police report containing the statements Wendy Chancey supposedly made

but can no longer recall. Of course, we will not hold an attorney ineffective for failing to offer inadmissible evidence.[3]  We also note, as did the district court, that if trial counsel had called Wendy Chancey or any other witness to testify at the guilt stage, under Florida law he would have forfeited his right to both open and close the arguments before the jury.

### THE  PENALTY  STAGE  INEFFECTIVENESS  CLAIM

At the penalty stage, in addition to relying upon the evidence that had been presented during the guilt stage, the State also proved that Tompkins had been convicted of two separate, knife-point abductions and rapes of convenience store clerks.  Both of those other crimes occurred after Tompkins sexually assaulted and murdered Lisa DeCarr on March 24, 1983, but before her body was found in June of 1984.  The first of those two rapes occurred on April 7, 1984, and the second on May 30, 1984.  Tompkins pled guilty to armed robbery, kidnaping, and sexual battery in connection with the first rape, and he pled no contest to kidnaping and sexual battery in connection with the second rape.  The prosecutor accurately argued to the jury that Tompkins had been convicted of five violent felonies prior to his conviction for the capital offense in the present case, saying, "That is his

---

[3]Tompkins makes essentially the same argument about several other pieces of evidence he contends trial counsel should have gotten in at the guilt stage. As to each and all of that evidence, it  was either not admissible under any valid theory, or there is no reasonable probability of a different result had it been admitted, or both.

15

violent past right there: two rapes, two kidnapings, and an armed robbery, five previous violent felony convictions." The prosecutor also argued that "these crimes he committed in Pasco County when he was raping these two other women on April 7, 1984, and May 30, 1984, Lisa DeCarr still had not been found. She was still buried under that house when this man unleashed his violence on these two other women in Pasco County." The crime was especially heinous, atrocious and cruel, the prosecutor urged, because as the fifteen-year-old victim resisted Tompkins' sexual advances and struggled against him, Tompkins strangled her to death with the sash of her bathrobe. He emphasized to the jury that Lisa DeCarr did not die instantly but instead had her life strangled out of her and must have realized before losing consciousness that she was going to die.

At the beginning of the penalty phase, trial counsel had informed the court that Tompkins had just decided that no mitigating circumstance evidence should be presented, because he did not want to spend the rest of his life in prison. Counsel did not want to forego presenting mitigating circumstances and asked the court for a recess so he would have an opportunity to talk his client into changing his mind. The trial court directed counsel to ignore his client's instructions and to present mitigating circumstance evidence.

Counsel called as mitigation witnesses Tompkins' two older sisters, and also a brother-in-law who had known him for fifteen years. The sisters testified that Tompkins was shy, had never displayed any violent behavior, had never hurt anyone, did not use obscene language, and had always worked and supported himself up until the time of his arrest. The brother-in-law testified he had known Tompkins for fifteen years, and that Tompkins had worked for him for four years in a roofing and construction business. He described Tompkins as a good employee who was always on time, good to follow orders, and eager to learn. He had not had any complaints from any customers about Tompkins, who never got into any arguments or fights with anyone.

In his closing argument, defense counsel pointed out that Tompkins had admitted his guilt for the two other crimes for which he had been convicted, and that no one had been seriously injured or killed in them. He also argued Tompkins' age as a statutory mitigating circumstance, and he discussed the non-statutory mitigating circumstances about which the defense witnesses had testified. He urged the jury to spare Tompkins' life.

The jury returned an advisory verdict unanimously recommending the death sentence. The trial court found three statutory aggravating circumstances: 1) previous convictions for felonies involving the use or threat of violence to the

person; 2) the murder was committed while the defendant was engaged in an attempt to commit sexual battery; and, 3) the murder was especially heinous, atrocious, or cruel. The court found one statutory mitigating circumstance: the defendant's age (twenty-six years old) at the time of the crime.[4] The trial court sentenced Tompkins to death.

Tompkins contends that trial counsel was ineffective at the penalty phase because he failed to present additional mitigating circumstance evidence. The state trial court conducted an evidentiary hearing on this claim, and although concluding that counsel's performance had been deficient, the court nonetheless rejected the claim because Tompkins had failed to establish prejudice, as required under the Strickland decision. On appeal, the Florida Supreme Court agreed with both aspects of the trial court's ruling. It found that counsel had been deficient because he failed to present some available mitigating circumstance evidence, but it also concluded that "this evidence would not have affected the penalty in light of the crime and the nature of the aggravating circumstances." See 549 So.2d at 1373. After conducting a de novo review, the district court agreed that Tompkins had failed to establish prejudice but found it unnecessary to determine whether or not

---

[4]The district court observed that "the finding of mitigation because of his age would seem extraordinarily generous."

trial counsel's performance had been outside the wide range of reasonable professional assistance. We follow the same path as the district court.

Under the prejudice prong of Strickland, "[i]t is not enough for the defendant to show that the error had some conceivable effect on the outcome of the proceeding." 466 U.S. at 693, 104 S.Ct. at 2067. Instead, "the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S.Ct. at 2069. A "reasonable probability" of a different result here, as in regard to the guilt stage, is one sufficient to undermine our confidence in the outcome. See id. at 694, 104 S.Ct. at 2052. That means Tompkins must convince us that if the additional mitigating circumstance evidence in question had been presented, "there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different." Horsley v. Alabama, 45 F.3d 1486, 1493 (11th Cir. 1995); accord Weeks v. Jones, 26 F.3d 1030, 1042 (11th Cir. 1994) ("[T]he petitioner must show ... there is a reasonable probability that the sentencer would have weighed the balance of aggravating and mitigating factors to find that the circumstances did not warrant the death penalty.") (quoting Bush v. Singletary, 988 F.2d 1082, 1090 (11th Cir. 1993) (per curiam)). In order to decide this issue we look at the mitigating circumstance

evidence that was not presented, along with that which was, and consider the totality of it against the aggravating circumstances that were found.

We have already set out the mitigating circumstance evidence that trial counsel did present at the penalty stage, so we turn now to the additional evidence which Tompkins contends should have been presented. It is primarily of three categories. The first category concerns physical abuse Tompkins suffered as a child. He was not abused by his parents, but by a man in the foster family with which Tompkins lived for several years until he was sixteen years old.[5] Tompkins told a number of family members and friends that he was treated unfairly by his foster father and was whipped and beaten by him.[6]

Evidence of physical abuse while a youth is admissible at sentencing, but Tompkins was twenty-six years old when he committed this capital offense. We have previously held that at least where there are significant aggravating circumstances and the petitioner was not young at the time of the capital offense,

---

[5]According to an affidavit from Tompkins' brother-in-law, Tompkins lived in the foster home from age 9 to age 16. Dr. Fleming's report said he lived there from age 7 to 16.

Although Tompkins' mother was far from an ideal parent, there is no suggestion she or his father ever physically abused him. Tompkins had good feelings towards both of them, and the only physical abuse he reportedly suffered was at the hands of Mr. Calhoun, the foster father.

[6]There is no evidence in the record that Tompkins ever said that Mr. Calhoun, the foster father, or anyone else, had actually sexually abused him. Two people did say Tompkins told them that Calhoun had unsuccessfully attempted to do so, and another person said that Tompkins had told her his foster brother had attempted to do so, also. See also n.10, infra.

20

"evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight." Francis v. Dugger, 908 F.2d 696, 703 (11th Cir. 1990) (petitioner was thirty-one years old at the time of the capital offense); accord, Mills v. Singletary, 63 F.3d 999, 1025 (11th Cir. 1995) ("We note that evidence of Mills' childhood environment likely would have carried little weight in light of the fact that Mills was twenty-six when he committed the crime."). Bolender v. Singletary, 16 F.3d 1547, 1561 (11th Cir. 1994) (same holding where petitioner was twenty-seven years old at the time of the capital offense).

The second category of mitigating circumstance evidence Tompkins contends his counsel should have presented is evidence of substance abuse. The evidence that Tompkins had a substance abuse problem is thin, consisting almost entirely of his own statements to Dr. Patricia Fleming, the psychologist who testified as his expert witness on mental state issues in the Rule 3.850 proceeding. Despite a professed awareness that, in her words, "anybody that is facing execution has every motivation to lie," Dr. Fleming believed Tompkins when he told her that he had taken drugs in the past and had ended up drinking beer and hard liquor in large quantities. Indeed, she wrote in her report that Tompkins began drinking at age seventeen and his alcohol consumption had increased until at the time of his arrest he was drinking one-half gallon of whiskey and one-half case

21

of beer every day, which resulted in black outs, memory loss, and related problems.

Tompkins' self-serving statements to Dr. Fleming regarding the enormous quantity of alcohol he consumed each day, and the results of it, were contradicted by the affidavits and evidentiary hearing testimony on his behalf by nine family members and close friends, people who had observed him closely at work and at home over the years.[7] Their sworn accounts provide a detailed description of Tompkins' personality and behavior, and although there is some reference in those accounts Tompkins' drinking, none of them indicate that he had a serious substance abuse or alcohol problem, or that he acted as though he did. Instead, with almost monotonous consistency those who knew Tompkins best described him as an industrious, dependable man, a good worker and provider who earned enough money as a roofer to buy presents for others and to regularly send his mother money. They tell how Tompkins was responsible about all of his obligations, kind, considerate, and caring, and how he was a stable influence on the children he was around. In short, the affidavit and evidentiary hearing testimony of nine people close to Tompkins indicate that he was anything but a

---

[7]Nine family members and friends signed affidavits on Tompkins' behalf, and five of those affiants also testified as witnesses for him at the Rule 3.850 hearing.

hopeless alcoholic or drug abuser, and foreclose any realistic possibility that he suffered from a serious substance abuse problem.

The opinion of a medical expert that a defendant was intoxicated with alcohol or drugs at the time of the capital offense is unreliable and of little use as mitigating circumstances evidence when it is predicated solely upon the defendant's own self-serving statements,[8] especially when other evidence is inconsistent with those statements. See Duren v. Hopper, 161 F.3d 655, 662 (11th Cir. 1998). A psychological defense strategy at sentencing is unlikely to succeed where it is inconsistent with the defendant's own behavior and conduct. See Weeks v. Jones, 26 F.3d at 1042; Bush v. Singletary, 988 F.2d at 1093. Moreover, even when there is a factual basis for it, a showing of alcohol and drug abuse is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing. See Waldrop v. Jones, 77 F.3d 1308, 1313 (11th Cir. 1996).

The third category of mitigating circumstance evidence Tompkins says that counsel should have presented at sentencing is the testimony of Dr. Fleming. She submitted a report in connection with the Rule 3.850 proceeding and testified at the

---

[8]Tompkins did not tell Dr. Fleming, or anyone else, that he was under the influence of drugs or alcohol at the time he murdered Lisa DeCarr. Instead, he adamantly insisted that he was completely innocent. Tompkins did tell Dr. Fleming, however, that he had a long standing problem with alcohol and that "prior to his arrest" – which was eighteen months after the crime – he was drinking a huge quantity of alcohol each day.

23

evidentiary hearing held during that proceeding. We have already discussed her factually unsupported conclusion that Tompkins had a serious alcohol or other substance abuse problem.

Dr. Fleming also found that Tompkins was "in the borderline of mental functioning," which is the terminology psychologists apply to a person who is below average intelligence but not mentally retarded.[9] According to the tests Dr. Fleming gave Tompkins, he had a verbal IQ of 86, a performance IQ of 75, and a full scale IQ of 79. The range for even mild mental retardation is an IQ of from 50-55 to approximately 70. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 40 (4th ed. 1994). Tompkins' scores were well above that range, but Dr. Fleming says the tests she gave him revealed signs of brain damage which "suggests that he's significantly and seriously impaired in higher levels of brain functioning," and "[h]e becomes confused easily." Dr. Fleming admitted under cross-examination that a CAT scan is a better method for detecting brain damage than the tests she used, but no CAT scan was given Tompkins. She also said Tompkins had suffered emotional deprivations because

---

[9] Dr. Fleming used the term "borderline of mental functioning," which she did not differentiate from "borderline intellectual functioning." The latter term is generally defined as describing someone with an IQ from 71 - 84. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 45 (4th ed. 1994).

he was separated while growing up from his natural parents, both of whom he loved very much.

Dr. Fleming insisted that Tompkins was not violent, but was himself a victim. She clung to that opinion even though Tompkins admitted to her that he had raped the two women in Pasco County at knife point. Dr. Fleming refused to acknowledge that those two crimes were actually violent, even though Tompkins told her he had held the knife to one victim's neck. When asked on cross-examination if she would not agree that a man who had stuck a knife to a woman's neck and raped her is a violent individual, Dr. Fleming paused for five seconds, and then would only say: "that was a violent act, depending on how you define violence." Throughout her testimony she adamantly refused to say that a man who would commit two rapes at knife point was a violent man. Nor would she concede that Tompkins would be especially dangerous if he was out on the street again. Asked if Tompkins, who had admitted two rapes and had also been convicted of sexual battery and murder or a fifteen-year old girl, could be dangerous in the future, Dr. Fleming said: "He has that capacity, as does everybody in this room." Dr. Fleming mischaracterized some of the statements in the affidavits that had been

25

presented on Tompkins' behalf in a way that made them more supportive of her

opinions about him.[10]

Dr. Fleming also indicated in her report that she believed Tompkins was

innocent, stating: "Mr. Tompkins' emphatic denial of involvement in the death is

convincing." She claimed to have read the trial record and even stated that the

circumstances of Lisa DeCarr's disappearance were sufficiently vague that there

was some doubt about whether she was even dead. Dr. Fleming's opinion that Lisa

DeCarr might not even be dead discredits her, because there was overwhelming

evidence that the skeletal remains found in the shallow grave beneath Lisa' s house

were those of Lisa. See pages 29 - 36, infra.

There is no real possibility that a jury would have been swayed toward a life

sentence by anything she said. Dr. Fleming is palpably biased. She accepted

everything Tompkins told her as the gospel, including the fact that the jury had

wrongfully convicted him -- a belief the jury itself was unlikely to embrace. Her

unwillingness to concede that the kidnapings and rapes Tompkins admitted

_____

[10]For example, Dr. Fleming's report categorically states: "Jerry Behringer, Wayne's brother-in-law, also reported in an affidavit that Wayne had told him of sexual molestation by Mr. Calhoun." Mr. Calhoun was the father in the foster family with whom Tompkins had lived for a number of years. Although Behringer's affidavit says Tompkins had told him that Mr. Calhoun had beaten him, it does not say Tompkins told Behringer that Calhoun had sexually assaulted him, only that Behringer had gotten that impression. None of the affidavits says Tompkins reported that Calhoun or anyone else had sexually assaulted him, and Tompkins apparently never told Dr. Fleming that, either.

committing at knife point are violent crimes shows the depth of her bias. Dr. Fleming saw Tompkins, a man who had been convicted of a total of six violent felonies involving sexual assaults on three different women as a non-violent victim himself. She described him as a "perpetual victim." We are confident the jury would have either totally rejected her testimony and opinions or given them very little weight.

We have considered all of the mitigating circumstance evidence Tompkins says should have been presented at the sentence stage, along with that which actually was presented.[11] But weighing against it are multiple, strong aggravating circumstances. The weight of those aggravating circumstances overwhelms the mitigating circumstance evidence that was and could have been presented. We conclude in this case, as the Supreme Court concluded in the <u>Strickland</u> case, that: "Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." 466 U.S. at 700, 104 S.Ct. at 2071.

---

[11]Among the other mitigating circumstance evidence Tompkins says should have been offered is the following: while a child he had to have his stomach pumped after he accidentally drank bleach and gasoline, respectively, on two separate occasions; he choked on a marble once and turned blue before it was dislodged; when seventeen-years old he was struck by lightening while using the telephone; and, he fell off of roofs four time during his career as a roofer. Dr. Fleming considered those events as corroborating her diagnosis of brain damage.

## THE GIGLIO CLAIM

Tompkins contends that at his trial the State "allowed the presentation of outright false testimony through the medical examiner about identifying Lisa with dental records," in violation of <u>Giglio v. United States</u>, 405 U.S. 150, 92 S.Ct. 763 (1972). In order to prevail with a <u>Giglio</u> claim, a petitioner must establish that the prosecutor "knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony," and that the falsehood was material. <u>United States v. Alzate</u>, 47 F.3d 1103, 1110 (11th Cir. 1995). For <u>Giglio</u> purposes, "the falsehood is deemed to be material 'if there is any reasonable likelihood that the false testimony <u>could</u> <u>have</u> affected the judgment of the jury.'" <u>Id.</u>, (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397 (1976)(emphasis added)).

Tompkins has failed to establish his <u>Giglio</u> claim concerning the medical examiner's testimony about whether dental records were used to identify the skeleton as that of the victim. Putting aside the absence of proof that the prosecution knew any more than defense counsel about whether dental records were used to identify the remains, Tompkins has failed to meet the threshold requirement that he show false testimony was used. The context of the claim is that after Tompkins was seen on March 24, 1983 struggling with Lisa DeCarr on

28

the sofa in her mother's house, where Tompkins stayed, no body was found until June 5, 1984. On that date, after Lisa had been missing for fourteen-and-a-half months, skeletal remains were found under that same house. Notwithstanding overwhelming evidence that the skeletal remains were those of Lisa DeCarr, the premise of Tompkins' Giglio claim concerning the medical examiner's testimony is that but for the false testimony about dental records there could have been a reasonable doubt that the skeletal remains were those of Lisa DeCarr.

The dental records testimony that Tompkins characterizes as false was given by Dr. Diggs, the Associate Medical Examiner for Hillsborough County. Dr. Diggs, a medical doctor and qualified pathologist, went to the site of the shallow grave when it was discovered on June 5, 1984, assisted in the removal of the skeletal remains, and performed the autopsy. He was able to identify the remains as those of a female in her midteens and Lisa DeCarr had been a fifteen-year old female.

Dr. Diggs testified that the top front teeth in the skull had an unusual formation: one tooth was recessed behind the other front teeth, an anomaly which is called an occluded or impacted tooth. He described for the jury the clothing found on the skeleton and the jewelry found with it. Lisa DeCarr's mother testified that Lisa had just such an unusual occluded tooth behind her front teeth,

29

and she identified the jewelry found with the skeleton as Lisa's. The skeleton was clothed in a pink robe, which a witness testified Lisa had been wearing on the morning of March 24, 1983, when she was struggling with Tompkins on the couch of the house underneath which the skeletal remains were later found. Dr. Diggs testified that the skeletal remains were of someone who had been dead for not less than six or seven months and not more than two years. Lisa DeCarr had been missing for between fourteen and fifteen months. Dr. Diggs filled out and signed a death certificate indicating that the skeletal remains were those of Lisa DeCarr.[12]

During cross-examination, the following exchange occurred between defense counsel and Dr. Diggs:

> Q. Doctor Diggs, you mentioned that you observed the teeth of the deceased.
>
> A. Yes.
>
> Q. Were you ever provided with any dental records to compare, such as the dental records of Lisa DeCarr to compare with the teeth that you were actually observing?
>
> A. We received – we received dental x-rays, yes, and this was – these x-rays were – these x-rays were used in order to make an identification.

---

[12]Dr. Diggs also testified that he found a ligature which had been tightly tied around the neck, and that in his opinion death had been caused by strangulation and had not been instantaneous.

30

Now, the identification generally is made by the dentist who is hired by the office as a consultant, but the x-rays are taken to compare the actual dental makeup of the mouth, and these comparisons are made to identify the individual, yes.

Q. Do you have those x-rays with you?

A. [Displaying.]

Q. How did you observe or how did you obtain, excuse me, these records?

A. Well, Doctor Powell is the individual who made these records and, of course, I would have to defer to him as to how these were – as to how these were made. All of this was done by him.

Q. Who is Doctor Powell?

A. Doctor Powell is the forensic odontologist for Hillsborough County. He is basically responsible for making identifications of teeth of individuals whom we – we would want a positive identification on.

Q. Am I correct in saying that Doctor Powell was hired by your office to take these x-rays?

A. No. He is actually hired by Hillsborough County. I don't know the terms of the contract or anything to that extent, but he is the individual who normally makes the determination of death and the identification of an individual who is skeletalized or an individual who is burned badly and is nonidentifiable.

There is a particular profession, a subspecialty of the dental profession in itself in which I have no expertise.

Q. Doctor Diggs, were you ever provided with dental records of Lisa DeCarr prior to your [sic] disappearing?

A. I was not, no.

The part of that testimony which Tompkins labels false is the answer to the second question quoted above, the question about whether Dr. Diggs had been provided with dental records of Lisa DeCarr to compare to the teeth of the skeleton.

As the district court pointed out, the answer in question is at most ambiguous, and any ambiguity was cleared up a few questions later. Dr. Diggs displayed the dental x-rays he was talking about and said they had been made by Dr. Powell, whom he identified as the county's forensic odontologist, one whose job it is to help identify bodies through dental evidence. The last question and answer quoted above shows that defense counsel understood that Dr. Diggs was not saying that he had been provided with "any dental records of Lisa DeCarr prior to your [sic] disappearing." The reference to "your" is obviously a typographical error in the manuscript or a slip of the tongue that everyone understood to be a reference to Lisa DeCarr's disappearance, not to any disappearance of Dr. Diggs. Whatever confusion may have been caused by his earlier answer, Dr. Diggs cleared things up when he conceded that he had not been provided any dental records of Lisa that had been made before she disappeared.

32

Furthermore, after Dr. Diggs testified, Barbara DeCarr took the stand and testified, among other things, that she had tried unsuccessfully to locate pre-mortem dental records of her daughter, Lisa DeCarr. Neither defense counsel nor the jury was or could have been misled by Dr. Diggs' ambiguous testimony about the dental records. There was no false testimony about the existence of pre-mortem dental x-rays or records.

Even if there had been false testimony on the subject, and even if the State had known it was false, Tompkins' <u>Giglio</u> claim would still fail on the materiality element, because he has not shown that the testimony in question could have had an effect on the verdict. The district court cogently summarized the overwhelming evidence that the skeletal remains were those of Lisa DeCarr:

> The State introduced Exhibit 10, a photograph of the skull that was taken from the grave (R 149), for the purpose of showing a dental anomaly of a tooth which had grown behind the subject's two front teeth in the same manner as Lisa's. Using Exhibit 10, Dr. Diggs described this unusual dental structure. (R 178) Subsequently, Barbara DeCarr testified that her daughter had the identical dental anomaly as that described by Dr. Diggs. (R 208) In addition, Stevens saw Petitioner, immediately prior to the time of the disappearance, assaulting Lisa. The body was found in a shallow grave beneath the house where she was assaulted and where she resided with her mother, her siblings, and Petitioner. Her remains were identified in several ways: the unusual dental feature; the remains being wrapped in Lisa's robe; and Lisa's earrings and ring given to her by her boyfriend

33

> being found adjacent to the skeletal remains in a position indicating that they had been worn by the victim. Coupled with the unsolicited confession Petitioner gave to Kenneth Turco, even if the medical examiner had given misleading testimony regarding identification of Lisa's body, there is no reasonable likelihood that such testimony could have affected the judgment of the jury.

In a footnote to that summary, the district court pointed out that the death certificate identifying the skeletal remains as Lisa DeCarr came into evidence without objection.

We add to the district court's summary the additional facts that the skeletal remains were those of a female in her midteens, and there is no other evidence that any other female in her midteens was missing in the area. Nor has Tompkins offered any explanation for how anyone else came to be buried – with Lisa's jewelry – under the house he shared with her, the same house in which he had been seen struggling with her as she wore a pink robe, the very same pink robe found on the skeleton.[13] There is simply no doubt that it was Lisa DeCarr whose skeletal remains were found in that shallow grave. With all due respect to the

---

[13]Lisa's mother was able to identify the pink robe found on the skeleton as Lisa's, because of the rose design or imprint it had on the collar.

advocacy obligations of Tompkins' present counsel, their argument in brief that "there was very little evidence of the identity of the deceased" is preposterous. [14]

## CONCLUSION

The district court's denial of Tompkins' amended petition for a writ of habeas corpus is AFFIRMED.

---

[14] Tompkins also contends that Giglio errors were committed in connection with witnesses Stevens and Turco. We agree with the district court that those contentions are palpably without merit, and we do not believe they need any more discussion than that given them by the district court.