872 So.2d 230 (2003)
Wayne TOMPKINS, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. SC01-1619.
Supreme Court of Florida.
October 9, 2003.
As Revised on Denial of Rehearing April 22, 2004.
Rehearing Denied June 25, 2004.
*233 Todd G. Scher, Litigation Director, Capital Collateral Regional Counsel-South, Martin McClain, Special Assistant Capital Collateral Regional Counsel and Suzanne Myers, Assistant Capital Collateral Regional Counsel, Fort Lauderdale, FL, for Appellant/Cross-Appellee.
Charles J. Crist, Jr., Attorney General and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Appellee/Cross-Appellant.
PER CURIAM.
Wayne Tompkins, a prisoner under sentence of death and an active death warrant, appeals an order of the circuit court denying in part his successive motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. The State cross-appeals the circuit court's order granting Tompkins a new penalty phase based on evidence that the trial court directed the State to prepare the sentencing order in an ex parte communication after the trial court imposed the death penalty.[1] We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the portion of the trial court's order denying Tompkins' motion for postconviction relief and reverse the portion of the trial court's order granting a new penalty phase.

FACTS AND PROCEDURAL HISTORY
In 1985, Tompkins was convicted of the first-degree murder of Lisa Decarr and *234 sentenced to death on the recommendation of a unanimous jury. See Tompkins v. State, 502 So.2d 415 (Fla.1986). This Court's opinion on direct appeal sets forth the following facts:
The victim, Lisa DeCarr, aged 15, disappeared from her home in Tampa on March 24, 1983. In June 1984, the victim's skeletal remains were found in a shallow grave under the house along with her pink bathrobe and jewelry. Based upon a ligature (apparently the sash of her bathrobe) that was found tied tightly around her neck bones, the medical examiner determined that Lisa had been strangled to death. In September 1984, Wayne Tompkins, the victim's mother's boyfriend, was charged with the murder.
At trial, the state's three key witnesses testified as follows. Barbara DeCarr, the victim's mother, testified that she left the house on the morning of March 24, 1983, at approximately 9 a.m., leaving Lisa alone in the house. Lisa was dressed in her pink bathrobe. Barbara met Wayne Tompkins at his mother's house a few blocks away. Some time that morning, she sent Tompkins back to her house to get some newspapers for packing. When Tompkins returned, he told Barbara that Lisa was watching television in her robe. Tompkins then left his mother's house again, and Barbara did not see or speak to him again until approximately 3 o'clock that afternoon. At that time, Tompkins told Barbara that Lisa had run away. He said the last time he saw Lisa, she was going to the store and was wearing jeans and a blouse. Barbara returned to the Osborne Street house where she found Lisa's pocketbook and robe missing but not the clothes described by Tompkins. Barbara then called the police.
The state's next witness, Kathy Stevens, a close friend of the victim, testified that she had gone to Lisa DeCarr's house at approximately 9 a.m. on the morning of March 24, 1983. After hearing a loud crash, Stevens opened the front door and saw Lisa on the couch struggling and hitting Tompkins who was on top of her attempting to remove her clothing. Lisa asked her to call the police. At that point, Stevens left the house but did not call the police. When Stevens returned later to retrieve her purse, Tompkins answered the door and told her that Lisa had left with her mother. Stevens also testified that Tompkins had made sexual advances towards Lisa on two prior occasions.
Kenneth Turco, the final key state's witness, testified that Tompkins confided details of the murder to him while they were cellmates in June 1985. Turco testified that Tompkins told him that Lisa was on the sofa when he returned to the house to get some newspapers for packing. When Tompkins tried to force himself on her, Lisa kicked him in the groin. Tompkins then strangled her and buried her under the house along with her pocketbook and some clothing (jeans and a top) to make it appear as if she had run away.
Id. at 417-18.
The jury recommended death by a vote of twelve to zero. After finding three aggravating circumstances[2] and one mitigating *235 circumstance,[3] the trial court imposed a sentence of death.
Tompkins raised ten issues on appeal, four related to the guilt phase[4] and six related to the penalty phase.[5]See id. at 419. This Court found no reversible error and affirmed both the conviction and death sentence. See id. at 421.
Tompkins' first motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 included nineteen claims. See Tompkins v. Dugger, 549 So.2d 1370, 1372 (Fla.1989).[6] After an evidentiary *236 hearing at which Tompkins presented evidence primarily related to his Brady and ineffective assistance of counsel claims, the trial court denied relief. See id. This Court affirmed the trial court's denial of relief on appeal. See id. With respect to Tompkins' Brady claims, we stated:
Tompkins claims that the state should have provided defense counsel with jail records showing that Tompkins was given Sinequan while in jail; school records indicating that Lisa had been seen by schoolmates after she allegedly was killed; and information suggesting that Tompkins' cell mate, who had testified that Tompkins confessed, was a state agent.
The record clearly reflects that counsel knew that Lisa reportedly was seen after the time established for her murder. Counsel attempted to introduce this very evidence through the hearsay testimony of Lisa's mother. We also agree that counsel's lack of knowledge that Tompkins asked for medication while in custody had no prejudicial effect on the outcome of the trial. Finally, we find no evidence in the record to support any theory that Tompkins' cell mate was a state agent. Accordingly, we affirm the trial court on the Brady issue.
Id.
As to Tompkins' claims of ineffective assistance of trial counsel, this Court concluded that counsel was not ineffective during the guilt phase but was deficient in failing to investigate and present evidence of mitigation in the penalty phase. See id. at 1373. However, we agreed with the trial court that this mitigating evidence would not "have affected the penalty in light of the crime and the nature of the aggravating circumstances." Id.
Tompkins also filed a petition for a writ of habeas corpus in this Court, raising nine claims. See id. at 1371.[7] We denied relief on all of Tompkins' claims. See id.
Subsequently, Tompkins filed a petition for a writ of habeas corpus in the federal district court. See Tompkins v. Moore, 193 F.3d 1327, 1329 (11th Cir.1999). The federal district court denied relief and Tompkins appealed to the Eleventh Circuit Court of Appeals. See id. The Eleventh Circuit affirmed without discussing several of the issues addressed by the district court.[8]
*237 The Eleventh Circuit also rejected Tompkins' argument that trial counsel was ineffective during the guilt phase for failing to introduce several pieces of evidence, including witness Wendy Chancey's testimony that she had seen Lisa alive after the date the murder was alleged to have occurred. See id. at 1334-35 & n. 3. With respect to Tompkins' claims of counsel's ineffectiveness during the penalty phase, the Eleventh Circuit concluded that the "weight of [the] aggravating circumstances overwhelm[ed] the mitigating circumstance evidence that was and could have been presented." Id. at 1339. Lastly, the Eleventh Circuit addressed Tompkins' argument that the State knowingly presented false testimony of Stevens, Turco, and the medical examiner in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).[9] The Eleventh Circuit rejected the claims as to Stevens and Turco outright, agreeing with the district court that Tompkins' "contentions are palpably without merit." Id. at 1342 n. 14.
With respect to Tompkins' Giglio claim regarding the medical examiner's testimony that dental records identified the skeleton as that of Lisa DeCarr, the Eleventh Circuit held that even if this had been false testimony and the State knew it was false, Tompkins' claim would still fail to meet the materiality element of the Giglio test. See id. at 1341. The Eleventh Circuit noted that there was "overwhelming" evidence that the skeletal remains belonged to Lisa and found Tompkins' argument that "`there was very little evidence of the identity of the deceased' ... preposterous." Id. at 1341-42.
On March 22, 2001, Governor Bush signed Tompkins' third death warrant,[10] which resulted in Tompkins filing a second postconviction motion in state court. After a Huff hearing,[11] the trial court concluded that an evidentiary hearing was required only on Tompkins' claim that the sentencing judge, Harry Lee Coe, erred in failing to (1) independently weigh the aggravating and mitigating circumstances, and (2) disclose that the State had prepared the sentencing order. After hearing several witnesses presented by Tompkins and argument from both Tompkins and the State, the trial court found that these errors entitled Tompkins to a new penalty phase.
The day after the evidentiary hearing, the trial court granted Tompkins' motion for a stay of execution. In a subsequent order on Tompkins' postconviction motion, the trial court provided written findings supporting the denial of all of Tompkins' other claims and the granting of the new penalty phase. The trial court also denied Tompkins' motions for DNA testing and to compel the disclosure of public records.
Tompkins now appeals, raising four issues: (1) whether the trial court erred in denying his Brady claims without an evidentiary hearing; (2) whether the trial court erred in denying his motion for DNA testing; (3) whether the State's failure to preserve evidence violated his due process rights; and (4) whether the trial court erred in denying his motion to compel the *238 production of public records. The State cross-appeals the trial court's order granting a new penalty phase.

I. BRADY CLAIMS
In Tompkins' first issue on appeal, he argues that the trial court erred in summarily denying his claim that the State withheld evidence in violation of Brady. Specifically, Tompkins contends that the State withheld several police reports and other documents[12] which he claims contain the following exculpatory evidence: (1) statements by individuals that tend to contradict the testimony of Barbara DeCarr, Stevens, and Turco; (2) information about other possible suspects; (3) information about a police investigation in the disappearance of Jessie Albach, one of Lisa DeCarr's friends, which was being investigated in conjunction with the DeCarr case; and (4) information related to the credibility of witnesses Stevens and Turco. Tompkins asserts that he was entitled to an evidentiary hearing and that the trial court erred in denying his Brady claims without holding a hearing.
In a case such as this, where the defendant files a successive motion for postconviction relief, the trial court may dismiss the motion if it "fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the movant or the attorney to assert those grounds in a prior motion constituted an abuse of procedure governed by these rules." Fla. R.Crim. P. 3.850(f). However, if the trial court does not dismiss the successive motion for the above stated reasons, the trial court must hold an evidentiary hearing unless "the motion, files and records in the case conclusively show that the movant is entitled to no relief." Fla. R.Crim. P. 3.850(d).
When the trial court denies postconviction relief without conducting an evidentiary hearing, "this Court must accept [the defendant's] factual allegations as true to the extent they are not refuted by the record." Rose v. State, 774 So.2d 629, 632 (Fla.2000); see also Valle v. State, 705 So.2d 1331, 1333 (Fla.1997) ("Under rule 3.850, a movant is entitled to an evidentiary hearing unless the motion and record conclusively show that the movant is entitled to no relief. Thus we must treat the allegations as true except to the extent they are rebutted conclusively by the record.") (citation omitted). However, the defendant has the burden of establishing a legally sufficient claim. See Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000). If the claim is legally sufficient, this Court must then determine whether the claim is refuted by the record. See id.
In Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the United States Supreme Court enunciated the three components of a true Brady violation as follows:
[1] The evidence at issue must be favorable to the accused, either because it *239 is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.
See also Cardona v. State, 826 So.2d 968, 973 (Fla.2002) (evaluating a Brady claim under the three prong test set forth in Strickler); Way v. State, 760 So.2d 903, 910 (Fla.2000) (same). Under the prejudice prong, the defendant must show that the suppressed evidence is material. See Strickler, 527 U.S. at 282, 119 S.Ct. 1936. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Way, 760 So.2d at 913 (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)) (alteration in original); see also Strickler, 527 U.S. at 290, 119 S.Ct. 1936. In determining materiality, the "cumulative effect of the suppressed evidence must be considered." Cardona, 826 So.2d at 973; see also Way, 760 So.2d at 913. With these principles in mind, we now address Tompkins' specific allegations.
First, we agree with the trial court that Tompkins' claim that the State withheld information related to the credibility of witnesses Stevens and Turcospecifically, that Stevens served time in jail for committing perjury in 1986 and that Turco pled guilty to extortion in 1995was insufficiently pled. Tompkins summarily states that these undisclosed facts about Stevens and Turco could have been used to impeach Stevens' and Turco's credibility at trial. However, he presents no explanation for how he could have accomplished this given that these events occurred after his trial. Further, Tompkins fails to allege any basis to establish that Stevens or Turco perjured themselves at his trial. Accordingly, we find no error in the trial court's summary denial of this claim.
We also agree with the trial court's conclusion that the March 24, 1983, police report was not withheld by the State. As the trial court noted, "[d]uring argument, defense counsel conceded that he had obtained a copy of ... [the March 24] report in 1989, however, he was unable to read it." Because defense counsel knew of the report and could have requested a legible copy, a Brady violation is conclusively refuted. Cf. Way, 760 So.2d at 911-12 (noting that evidence is not "suppressed" where the defendant was aware of the exculpatory information).
As to the list of questions to be asked of Detective Burke and the Jessie Albach files, these documents fail to meet the first prong of Brady because they do not contain information that is favorable to Tompkins. The few answers indicated on the question sheet are irrelevant to Burke's substantive testimony. Contrary to Tompkins' assertions, the alleged nondisclosure of the list of questions in this case is not analogous to the situation presented in Rogers v. State, 782 So.2d 373, 384 (Fla.2001), where this Court held that a cassette tape, which revealed coaching by the prosecutor and conflicting accounts of the witness's testimony, was favorable to the defendant. Unlike the tape at issue in Rogers, the list of questions in this case does not show any attempt by the prosecutor to direct Burke's testimony. Nor does the list indicate any testimony contrary to that presented at trial.
We also reject Tompkins' argument that because the Albach and DeCarr cases were investigated together and there are statements regarding Lisa in the Albach reports, these reports constitute Brady material. In Rogers, this Court held *240 that police reports generated in a joint law enforcement investigation of robberies similar to the one for which the defendant was arrested were favorable to the defendant. See id. at 380-82. This Court concluded that the police reports were favorable to Rogers because they could have been used to show that a person other than Rogers was involved in the robbery with the codefendant and, therefore, the reports could have been used to impeach the codefendant's testimony at trial. See id. at 382.
The Albach documents contain statements regarding Lisa DeCarr and provide information about a W.H. Graham, a person who Tompkins apparently claims is another likely suspect. However, other than the fact that Jessie and Lisa were friends, there is no indication in these reports that Lisa ever had contact with W.H. Graham. Further, the statements about Lisa are generalthat Lisa was missing and was friends with Jessie. Thus, these files do not provide the same type of information that this Court concluded was favorable to the defendant in Rogers.[13]
As to the remaining documents, we conclude that even if the information they contain could be said to be favorable to Tompkins, the record in this case conclusively demonstrates that the documents are not material because they cannot "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Cardona, 826 So.2d at 982 (quoting Way, 760 So.2d at 913). Tompkins argues that the information related to police by Maureen Sweeny in the June 8, 1984, police report supports Wendy Chancey's version of the events and supports the defense's theory that Lisa ran away.[14] We reject this argument for several reasons. First, as previously noted, Chancey did not testify at trial. Second, although Tompkins appears to assume that Sweeny's information was gained from Barbara DeCarr and Tompkins, the report does not indicate who told Sweeny about the version of the events she gave to the police. Third, the fact that Lisa DeCarr's brother and boyfriend went to look for her does not shed any new light on her disappearance because it is clear from the record that Lisa was originally classified as a runaway. Lastly, other than conclusory statements, Tompkins provides no evidence or argument to support *241 his claims of an unreliable investigation by police. Therefore, the only part of the June 8, 1984, report that is even conceivably favorable to Tompkins is a statement made by Sweeny's fiance, Mike Glen Willis, that includes an account of the events on the day Lisa disappeared that is inconsistent with Barbara DeCarr's trial testimony.[15] However, this one piece of undisclosed inconsistent information, even taken together with any other favorable evidence the State may have failed to disclose to Tompkins, does not rise to the level necessary to undermine our confidence in the verdict in this case.
Tompkins also argues that a July 28, 1983, report contains an account of a phone call from Barbara DeCarr that contradicts her trial testimony. We disagree. In the phone call, Ms. DeCarr stated that she reported that Lisa ran away on March 24, 1983, and that she thought Lisa might be with Jessie. At trial, Ms. DeCarr never stated that she did not, at first, believe that Lisa ran away. In fact, Ms. DeCarr testified that after Tompkins told her Lisa ran away, she called the police. She also testified that she contacted Child Search of Florida and that prior to May 1984 she refused to suspect that Tompkins was involved in Lisa's disappearance. Accordingly, the record conclusively refutes Tompkins' claim that the July 28 report is material evidence because the report would not have impeached Ms. DeCarr's trial testimony. Compare Cardona, 826 So.2d at 981 (concluding that withheld impeachment evidence regarding the State's key witness was of such a degree that it "could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict").
Finally, we conclude that as to Burke's lead sheets, prejudice is conclusively refuted by the record. Tompkins contends that the lead sheets show that Burke spoke with Lisa's boyfriend, Junior Davis, and had Tompkins known this he would have ascertained whether Davis told police about meeting Stevens at the corner store on the day of Lisa's disappearance. Tompkins also asserts that the lead sheets indicate the true identity of a Bob McKelvin, who allegedly attempted to solicit Lisa. However, the record shows that defense counsel was aware of both Junior Davis and Bob McKelvin during trial. Defense counsel asked Stevens on cross-examination about her encounter with Davis at the corner store. Defense counsel also questioned both Detective Burke and Barbara DeCarr about McKelvin. Detective Burke testified that he could not recall hearing the name McKelvin but he was aware of a neighbor who made sexual advances towards Lisa. Barbara DeCarr testified that McKelvin did proposition her daughter.
Thus, we affirm the trial court's summary denial of Tompkins' Brady claims. Either the undisclosed documents are not Brady material because they are neither favorable to Tompkins nor suppressed, or Tompkins has not demonstrated that he was prejudiced by the lack of disclosure. Further, even if we were to engage in a cumulative analysis and consider the undisclosed, favorable documents in conjunction with Tompkins' claims raised in his first motion for postconviction relief, our conclusion as to prejudice would not *242 change. See Way, 760 So.2d at 915 (noting that conducting a cumulative analysis would not change the Court's conclusion that the defendant failed to establish prejudice).

II. DNA TESTING
On April 10, 2001, Tompkins filed a motion for DNA testing, seeking to have several pieces of evidence tested, including hair samples discovered with Lisa's remains at the grave site. A hearing was held on April 11, 2001, at which Tompkins argued that since the time this evidence was originally submitted for testing by the State in 1984, mitochondrial DNA testing had developed and would now allow DNA to be extracted from the hair samples.[16] After the trial court orally denied the motion at the hearing, the State revealed that it could not locate the hair samples and Tompkins was permitted to question several witnesses regarding this missing evidence.[17]
In an order dated April 12, 2001, the trial court denied Tompkins' motion, finding that the evidence sought to be tested had been available since 1984, that mitochondrial DNA testing had been available in judicial proceedings since 1996, and that mitochondrial DNA testing had been used in the Thirteenth Judicial Circuit in 1999. The trial court also found that Tompkins failed to set forth any compelling reasons for the DNA testing and that mitochondrial DNA testing would not prove or disprove any material issues in the case.
The trial court again denied Tompkins' request for DNA testing in its order denying Tompkins' motion for postconviction relief and in its order denying Tompkins' motion for rehearing. In the latter order, entered on June 15, 2001, the trial court expanded on its reason for denying the motion for DNA testing in light of the enactment of section 925.11, Florida Statutes (2002).
Section 925.11 requires that the trial court make the following findings after the defendant has filed a sufficient petition and the State has responded:
1. Whether the sentenced defendant has shown that the physical evidence that may contain DNA still exists.
2. Whether the results of DNA testing of that physical evidence would be admissible at trial and whether there exists reliable proof to establish that the evidence has not been materially altered and would be admissible at a future hearing; and
3. Whether there is a reasonable probability that the sentenced defendant would have been acquitted or would have received a lesser sentence if the DNA evidence had been admitted at trial.
§ 925.11(2)(f), Fla. Stat. (2002). In this case, the trial court rejected Tompkins' claim that there is an issue of the identity of the remains, noting that the Eleventh Circuit Court of Appeal had addressed this issue and found Tompkins' argument that "`there was very little evidence of the identity of the deceased' ... preposterous." Tompkins, 193 F.3d at 1342. The trial court further found that any samples of DNA obtained from the hairs, bone fragments, robe or pajamas would be "unreliably contaminated due to the location of the remains and would not prove *243 [Tompkins'] innocence or result in a mitigation of sentence."
We agree with both of the trial court's findings. Given the evidence presented at trial regarding the identity of the remains[18] and the location of the remains, we conclude that even if the DNA analysis indicated a source other than Lisa DeCarr or Tompkins, there is no reasonable probability that Tompkins would have been acquitted or received a life sentence. See § 925.11(2)(f), Fla. Stat. (2002); Fla. R.Crim. P. 3.853; see also King v. State, 808 So.2d 1237, 1247-49 (Fla.2002) (affirming trial court's denial of defendant's motion for mitochondrial DNA testing, where trial court found that even if test showed that hair found on victim's body did not come from victim or defendant, there was no reasonable probability that defendant would have been acquitted or have received a life sentence). Accordingly, we affirm the trial court's denial of Tompkins' motion for DNA testing.
In a related claim, Tompkins argues that the trial court erred in finding that there was no bad faith on the part of the State regarding the loss of hair samples discovered with Lisa's remains. See Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."); see also King, 808 So.2d at 1242-43 (approving trial court's application of Youngblood in evaluating defendant's claim regarding State's destruction of evidence). In light of our conclusion that the trial court did not err in denying Tompkins' motion for DNA testing, we conclude that this issue is moot.

III. PUBLIC RECORDS
In his final issue on appeal, Tompkins argues that he has been denied effective assistance of counsel because the trial court denied him access to public records from the Hillsborough County Sheriff's Office, the State Attorney's Office of the Thirteenth Judicial Circuit, the Florida Department of Law Enforcement, the Division of Elections, the Department of Corrections, the Florida Parole Commission, and the Board of Executive Clemency. In denying Tompkins' motion to compel the production of records, the trial court found that Tompkins "failed to provide sufficient specific and identifiable reasons as to the request for public records." The trial court noted that the only issue raised at the hearing on Tompkins' motion to compel was related to juror misconduct and that postconviction counsel both conceded that this issue was known to "himself and trial counsel in 1985" and "provided no explanation as to why requests were not made until after the Governor signed the death warrant." The trial court also expressed concern "regarding the timing of the voluminous public records requests," finding that the requests "appear to be at best a `fishing expedition' and at worst a dilatory tactic."
We review the trial court's denial of Tompkins' motion to compel for an abuse of discretion. See generally Glock v. Moore, 776 So.2d 243, 254 (Fla.2001) (concluding that trial court did not abuse discretion in denying defendant's motions to compel and determining that defendant's right to public records was not denied). In Sims v. State, 753 So.2d 66 (Fla.2000), we addressed the issue of public records where the request is made after the death warrant has been signed:

*244 The language of section 119.19 and of rule 3.852 clearly provides for the production of public records after the governor has signed a death warrant. However, it is equally clear that this discovery tool is not intended to be a procedure authorizing a fishing expedition for records unrelated to a colorable claim for postconviction relief....
... Rule 3.852 is not intended for use by defendants as, in the words of the trial court, "nothing more than an eleventh hour attempt to delay the execution rather than a focused investigation into some legitimate area of inquiry."
Id. at 70. Thus, a defendant must show how the requested records relate to a colorable claim for postconviction relief and good cause as to why the public records request was not made until after the death warrant was signed. See Glock, 776 So.2d at 254; Bryan v. State, 748 So.2d 1003, 1006 (Fla.1999).
Tompkins argues that he could not have made this public records request earlier because at the time this Court issued its decision in Buenoano v. State, 708 So.2d 941 (Fla.1998), making it clear that any such claim will be barred if counsel fails to exercise due diligence, Tompkins was litigating in federal court and then was precluded by the adoption of Florida Rule of Criminal Procedure 3.852 from filing his request before his death warrant was signed. This argument fails for three reasons.
First, although a request for public records under rule 3.852(h)(3) is contingent upon the signing of a death warrant, rule 3.852(i) "allows collateral counsel to obtain additional records at any time if collateral counsel can establish that a diligent search of the records repository has been made and `the additional public records are either relevant to the subject matter of the postconviction proceeding or are reasonably calculated to lead to the discovery of admissible evidence.'" Sims, 753 So.2d at 70-71 (quoting rule 3.852(i)(1)). Accordingly, Tompkins was not required to wait until the death warrant was signed to make an additional public records request, provided he could have made the required showing under rule 3.852(i).
Second, Tompkins' request for information from the Division of Elections related to Judge Coe's campaign contributions could have been made years ago, and Tompkins has not indicated any good cause as to why he did not make this request until after the death warrant was signed. Similarly, Tompkins' request for juror criminal records could also have been made years ago. As noted by the trial court, counsel conceded that this issue was known to trial counsel in 1985 and provided no explanation as to why the requests were not made until after the death warrant was signed. Accordingly, we conclude that the trial court did not abuse its discretion in denying Tompkins' motion to compel the production of public records.[19]

IV. THE STATE'S CROSS-APPEAL
On cross appeal, the State seeks reversal of the trial court's decision to *245 grant Tompkins a new penalty phase trial.[20] In its order granting the new penalty phase, the trial court stated:
The Court finds that testimony demonstrates that there was an ex parte communication between the sentencing judge and the State in this case. The Court finds that the limitation of argument that the Court imposed for the State is not a sufficient "weighing" by the trial judge. The Court finds that the failure to independently weigh aggravating and mitigating circumstances in this case entitles Defendant to relief.
State v. Tompkins, No. 84-10538, order at 10 (Fla. 13th Cir. Ct. order filed Apr. 20, 2001). Based on our review of the record of the trial, direct appeal, and postconviction proceedings in the state and federal courts, we conclude that the trial court erred in granting Tompkins a new penalty phase trial.
For the purpose of analyzing the trial court's ruling, we have assumed, without deciding, that there was competent, substantial evidence presented at the evidentiary hearing for the trial court to conclude that Judge Coe either himself communicated or had his assistant communicate to the prosecutor that the prosecutor was to prepare the written sentencing order, and that the prosecutor did in fact prepare the written sentencing order which was entered by Judge Coe.[21] Although we do not condone the ex parte communication, we conclude that under the circumstances of this case, which we here set out in detail, Tompkins is not entitled to a new penalty phase because he has not demonstrated that he was denied his right to a neutral, detached judge or that Judge Coe failed to independently weigh the aggravating and mitigating circumstances. Compare Randolph v. State, 853 So.2d 1051, 1057 (Fla. 2003) (concluding that the defendant was not denied a neutral, detached judge where the judge's law clerk engaged in an ex parte communication with the prosecutor but there was no evidence that the judge either determined that the defendant would receive a death sentence prior to the sentencing proceedings or did not independently weigh the aggravating and mitigating circumstances) with Porter v. State, 723 So.2d 191, 197 (Fla. 1998) (concluding that the defendant was entitled to a new sentencing based on evidence that the trial judge made up his mind to sentence the defendant to death before the penalty proceedings began).
Our analysis begins with the return of the jury in the 1985 penalty phase trial. Upon receiving the jury's recommendation of death by a 12-0 vote, the court immediately pronounced sentence:
THE COURT: Okay. Record the verdict. Discharge the jury. Approach the bench. No, I mean out there. Bring the defendant forward. Any further comments?
MR. HERNANDEZ [DEFENSE COUNSEL]: No, your honor.
THE COURT: Okay. I will accept the jury's finding of guilt and its recommendation of the death penalty. Make an adjudication of guilt. Can you or your *246 client show cause why sentence should not be pronounced at this time?
MR. HERNANDEZ: No, your honor.
THE COURT: It's the judgment, order, and sentence of this Court that the defendant be sentenced to death in the electric chair.
Although we changed this procedure after the penalty phase in this 1985 trial,[22] at the time of this penalty phase trial, this Court had held that the pronouncement of a death sentence at the time of the jury's return with a recommendation of death was not reversible error. See Randolph v. State, 463 So.2d 186, 192 (Fla.1984). Moreover, if Tompkins were to pursue an issue with respect to Judge Coe's having pronounced the sentence upon the return of the jury's advisory sentence, Tompkins had to do so in his direct appeal. This issue is therefore not presently before this Court. However, the above portion of the record establishes what has been a known fact since 1985 that Judge Coe had considered and decided that death was the appropriate sentence before the written sentencing order was entered.
The sentencing order which was thereafter entered set out three aggravating circumstances: (1) Tompkins was previously convicted of felonies involving the use or threat of violence to a person; (2) the murder was committed while Tompkins was engaged in an attempt to commit sexual battery; and (3) the murder was especially heinous, atrocious, or cruel (HAC). The only mitigating circumstance provided in the order was Tompkins' age (twenty-six) at the time of the murder.
On direct appeal, this Court found that competent, substantial evidence in the record supported those three aggravating factors. Importantly, for present purposes, this Court stated the following:
Appellant next contends that the trial court did not give adequate consideration to the evidence of nonstatutory mitigating circumstances. With respect to nonstatutory mitigating circumstances, the trial court stated that it found "NONE, notwithstanding testimony to the effect that the defendant was a good family member and good employee." We conclude that the judge did consider the evidence but found that it did not rise to a sufficient level to be weighed as a mitigating circumstance.
Appellant's final claim of error is that the trial judge did not make a reasoned independent judgment of whether or not the death penalty should be imposed. Appellant bases this argument on the trial judge's written order stating that the jury's death recommendation is "entitled to great weight." We reject this claim. The trial court expressly stated: "After considering only the evidence before the jury, the court finds that the aforesaid statutory aggravating circumstances clearly outweigh the statutory mitigating circumstance." There is nothing in the court's order or elsewhere in the record to suggest that the trial court imposed the death penalty because it felt compelled to do so by the jury's recommendation.

Tompkins, 502 So.2d at 421 (emphasis supplied).
*247 This statement shows that on direct appeal this Court conducted a detailed record review of the trial court's order. Based on that review, this Court concluded that the record supported the finding of three very weighty aggravators and the finding of only one weak mitigator. It remains evident that the three weighty aggravators outweigh the one weak mitigator of age. Thus, based upon the record in this case through direct appeal, we conclude that the issue concerning the preparation of the sentencing order is not a substantive issue of whether the aggravators outweighed the mitigators, but rather is a procedural issue of whether Judge Coe himself conducted the requisite weighing of aggravators and mitigators at the time the sentencing order was prepared.
Because the relevant concern underlying the requirement that the trial judge prepare the sentencing order is assuring that the judge independently weigh the aggravating and mitigating circumstances, see Patterson v. State, 513 So.2d 1257, 1261 (Fla.1987), we have determined that this procedural issue was resolved during the pendency of this case. Following this Court's decision affirming Tompkins' conviction and death sentence on direct appeal, Tompkins filed his initial rule 3.850 motion for postconviction relief, and Judge Coe held an evidentiary hearing on the motion on May 19 and 20, 1989. At the hearing, Tompkins argued that his trial counsel was ineffective in failing to present additional mitigating evidence during the penalty phase at trial. See Tompkins v. Dugger, 549 So.2d 1370, 1372 (Fla.1989). Following that evidentiary hearing, Judge Coe denied relief. He expressly found that the additional mitigators asserted by Tompkins "would not have affected the penalty in light of the crime and the nature of the aggravating circumstances." Id. at 1373. Judge Coe reasoned that the additional mitigating evidence did not create "a reasonable probability that but for the counsel's errors, the results in the sentencing phase would have been different, given the 12/0 verdict, given the egregious nature of the offense, given the two prior rapes." Record at 470, Tompkins v. Dugger (No. 74235). Judge Coe stated, "I don't think there was a reasonable possibility, given proper investigation, preparation and presentation, that the outcome would have been different, nor do I think this lack undermined any confidence in the outcome." Id.
This Court approved Judge Coe's conclusion based on his weighing of the aggravating and mitigating circumstances following an evidentiary hearing. See Tompkins, 549 So.2d at 1373. Furthermore, this Court affirmed the death sentence after additional mitigating evidence which had not been presented at trial, was presented and weighed at the evidentiary hearing.
On review of the denial of Tompkins' federal habeas petition, the Eleventh Circuit Court of Appeals similarly "considered all of the mitigating circumstance evidence Tompkins says should have been presented at the sentence stage, along with that which was actually presented," and concluded that the weight of the "multiple, strong aggravating circumstances ... overwhelm[ed] the mitigating circumstance evidence that was and could have been presented." Tompkins v. Moore, 193 F.3d 1327 (11th Cir.1999).
Accordingly, based upon this examination of the record in this case, we conclude that Tompkins has not demonstrated that he was denied a neutral, detached judge or that Judge Coe failed to independently weigh the aggravating and mitigating circumstances at the time the sentencing order was prepared.

*248 CONCLUSION
Based on the forgoing, we affirm the trial court's summary denial of Tompkins' Brady claims and affirm the trial court's denial of Tompkins' motion for DNA testing and motion to compel the production of public records. However, we reverse the trial court's order granting a new penalty phase trial and reinstate the death sentence. The stay of execution is dissolved effective 30 days after this decision becomes final.
It is so ordered.
WELLS, PARIENTE, LEWIS, CANTERO and BELL, JJ., concur.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
QUINCE, J., recused.
ANSTEAD, C.J., concurring in part and dissenting in part.
The only disagreement I have with the majority is the holding that the trial court erred in granting Tompkins a new sentencing phase based on his claim that the sentencing judge failed to independently weigh the aggravating and mitigating circumstances and failed to disclose that the State prepared the sentencing order. This holding is directly contrary to our controlling law, fails to respect the role of the trial judge as fact-finder, and conflicts with the outcome of a recent case involving almost identical circumstances and the same sentencing judge.[23]
In granting relief on this claim, the trial court explained:
During the April 17, 2001 hearing, the State conceded that an evidentiary hearing was necessary on this claim. On April 18, 2001, the Court conducted an evidentiary hearing on this claim. Based upon the testimony of the witnesses and the argument of counsel, the Court finds that Defendant is entitled to relief with regard to this claim.
After the evidentiary hearing, the Court finds that the former State Attorney, Mike Benito, admitted drafting the sentencing order for the Defendant. The Court finds that Mr. Benito drafted the order after being contacted by the judge or the judge's office. Additionally, the Court finds that the sentence of the Defendant was pronounced immediately after the jury provided its recommendation. (See Transcript of Sentencing, attached).
Florida Statutes require that the sentencing judge independently weigh the aggravating and mitigating circumstances. Fla. Stat. 921.141 (1985). It is impossible for a judge to request that any party draft any sentencing order which requires the weighing of aggravating and mitigating circumstances. See Card v. State, 652 So.2d 344 (Fla.1995) and Spencer v. State, 615 So.2d 688 (Fla. 1993).
The Court finds that testimony demonstrates that there was an ex parte communication between the sentencing judge and the State in this case. The *249 Court finds that the limitation of argument that the Court imposed for the State in arguing aggravating and mitigating circumstances is not sufficient "weighing" by the trial judge. The Court finds that the failure to independently weigh aggravating and mitigating circumstances in this case entitles Defendant to relief.
As noted above, these findings are supported by the evidence and this Court's law.
In this case, prosecutor Benito testified that although he did not have a specific recollection of being called by Judge Coe's office, he prepared the sentencing order in this case as he had done in other cases for Judge Coe. The State presented no evidence to refute Benito's testimony that he was asked by Judge Coe, in an ex parte communication, to prepare the order. Further, the record supports the trial court's finding that there was no weighing of the aggravating and mitigating circumstances in this case. Judge Coe pronounced sentence immediately following the jury recommendation, and as in State v. Riechmann, 777 So.2d 342 (Fla.2000), the record does not contain any oral findings reflecting any independent weighing of the aggravating and mitigating circumstances by Judge Coe.
Further, Tompkins' trial counsel and prior postconviction counsel testified that they were unaware that the sentencing order had been prepared by the State. Although the State makes a due diligence argument, the State cites nothing in the record that would have led counsel to conclude that the State prepared the sentencing order.
In Roberts v. State, 840 So.2d 962 (Fla. 2002), Maharaj v. State, 778 So.2d 944 (Fla.2000), and State v. Riechmann, 777 So.2d 342, 351 (Fla.2000), the defendants were granted new sentencing proceedings based on the same claim Tompkins presented in this case. In Maharaj, the State did not appeal the trial court's granting of a new sentencing proceeding and this Court affirmed this issue without discussion. See 778 So.2d at 947-48, 959. In Riechmann, this Court reviewed the trial court's order granting a new penalty phase and concluded that the trial court properly considered "the nature of the contact between the judge and the prosecutor, when the judge was given the order, and when he gave copies to the defendant," in determining that "Riechmann was denied an independent weighing of the aggravating and mitigating circumstances." 777 So.2d at 352. This Court noted that the record supported the trial court findings that "the record contains no oral findings independently made by the trial judge, which satisfies the weighing process required by section 921.141(3), nor did defense counsel know that the State prepared a sentencing order to which he failed to object." Id.
Most recently, in Roberts, this Court affirmed the trial court's findings that the sentencing order was prepared by the State after an ex parte communication with the trial judge. Although contradictory evidence was presented as to whether the trial judge asked the State to prepare the sentencing order, this Court found that the lower court's ruling was supported by substantial competent evidence and affirmed the grant of a new sentencing proceeding. See Roberts, 840 So.2d at 972-73.
Because the trial court's order indicates that the judge properly considered the factors set forth in this Court's controlling case law, I would affirm the trial court's order for a new penalty phase.
NOTES
[1] Tompkins filed this successive motion after a death warrant was signed and the warrant was stayed by the trial court after the trial court vacated the death sentence and granted Tompkins a new penalty phase.
[2] The aggravating circumstances found by the trial court were: (1) the previous conviction of felonies involving the use or threat of violence to the person; (2) that the murder was committed while the defendant was engaged in an attempt to commit sexual battery; and (3) that the murder was especially heinous, atrocious, or cruel ("HAC").
[3] The one mitigating circumstance the trial court found was that Tompkins was twenty-six at the time of the murder.
[4] With respect to the guilt phase, Tompkins argued: (1) the trial court erred in admitting his confession through Turco's testimony; (2) the trial court erred in limiting his cross-examination of State's witnesses Barbara DeCarr and Detective Burke; (3) the trial court erred in permitting the State to elicit certain testimony from Barbara DeCarr on redirect examination; and (4) death-qualified juries are unconstitutional.
[5] As to the penalty phase, Tompkins argued: (1) the trial court erred in allowing two police officers to testify as to details of previous crimes he had committed; (2) the trial court erred in finding the aggravating circumstance of previous conviction of felonies involving the use or threat of violence; (3) the trial court erred in finding the aggravating circumstance that the murder was committed during an attempted sexual battery; (4) the trial court erred in finding HAC; (5) the trial court did not give adequate consideration to the evidence of nonstatutory mitigating circumstances; and (6) the trial judge did not make a reasoned independent judgment of whether or not the death penalty should be imposed by giving undue weight to the jury's recommendation of death.
[6] These claims were: (1) Florida Rule of Criminal Procedure 3.851 denies equal protection and access to the courts by empowering the Governor to shorten the two-year filing deadline of rule 3.850; (2) the trial court erred in excluding hearsay testimony offered to show that the victim was alive after the time of the alleged murder; (3) the proceedings were rendered fundamentally unfair when Tompkins' court-appointed counsel withdrew to accept a position with the prosecutor's office; (4) Tompkins' right to counsel was violated when a jailhouse informant (Turco) was placed in his cell to elicit inculpatory statements; (5) the conviction and sentence resulted from an unreliable in-court identification; (6) the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), including (a) jail records showing Tompkins was given Sinequan, (b) information suggesting that Turco was a State agent, and (c) records indicating that the victim had been seen by schoolmates after she was allegedly killed; (7) Tompkins' trial counsel was ineffective during the guilt phase by (a) failing to adequately investigate and prepare the issue regarding who was the last person to see the victim alive, (b) failing to present evidence that informant Turco had access to police reports that Tompkins had in his cell, (c) failing to object to hearsay testimony by the medical examiner as to the victim's identity, (d) failing to ensure compliance with the witness sequestration rule, and (e) failing to litigate the issues raised in claims 2, 3, 4 and 5; (8) Tompkins' trial counsel was ineffective for failing to provide for an adequate evaluation by a mental health expert; (9) Tompkins' counsel was ineffective during the penalty phase for (a) failing to adequately investigate and prepare mitigation evidence, (b) failing to limit damage caused by the introduction of prior sexual batteries, and (c) failing to challenge jury instructions and failing to object to other errors related to claims 11 and 16; (10) the State knowingly used false and misleading testimony of Detective Burke and the medical examiner; (11) the State made an improper "golden rule" argument; (12) the trial court's finding of HAC was in violation of Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); (13) there was an impermissible burden shift; (14) the jury was improperly instructed that sympathy toward the defendant was an improper consideration; (15) the trial court considered an unconstitutional aggravating circumstance; (16) the death sentence was founded upon impermissible "victim impact" evidence; (17) there was a violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (18) the death sentence was based on misinformation; and (19) there were improper jury influences.
[7] These claims were: (1) the penalty phase jury instruction impermissibly shifted the burden to the defendant to show that the death penalty was inappropriate; (2) the jury was improperly instructed that sympathy toward the defendant was an improper consideration; (3)Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), required reversal of the trial court's finding of HAC; (4) the State made an improper "golden rule" argument; (5) Tompkins' right to counsel was denied when the trial court erred in excluding hearsay testimony offered to show that the victim was alive after the time of the alleged murder; (6) there was a violation of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987); (7) appellate counsel was ineffective for failing to object to photographs of the victim's skeletal remains; (8) the death sentence impermissibly rested on the automatic aggravator of a prior felony conviction; and (9) there was a violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
[8] These issues were: (1) whether Tompkins was denied the right to present a defense and confront witnesses; (2) whether the state withheld exculpatory evidence in violation of Brady; (3) whether appellate counsel was ineffective; (4) whether Tompkins' conviction and sentence resulted from an unreliable in-court identification; (5) whether the judge and jury were misinformed; (6) whether there was improper argument and a jury instruction error during the penalty phase; and (7) whether the district court erred in failing to order the grand jury proceedings transcribed. See Tompkins, 193 F.3d at 1331 n. 1.
[9] Under Giglio, a prosecutor has a duty to correct testimony he or she knows to be false. See 405 U.S. at 153-54, 92 S.Ct. 763. In order to establish a Giglio violation, a defendant must show that (1) the testimony was false; (2) the prosecutor knew of the false testimony; and (3) the testimony was material. See Routly v. State, 590 So.2d 397, 400 (Fla.1991).
[10] Two death warrants signed in 1989 by Governor Martinez were stayed because Tompkins' initial postconviction motions were still being litigated.
[11] Huff v. State, 622 So.2d 982 (Fla.1993).
[12] These documents include: (1) a June 8, 1984, police report; (2) a legible copy of a March 24, 1983, police report; (3) a July 28, 1983, police report; (4) handwritten lead sheets prepared by Detective Burke; (5) a May 3, 1984, report concerning interviews with W.H. Graham; (6) an August 18, 1982, report; (7) a December 27, 1983, letter from the State Attorney; (8) a May 21, 1984, report; (9) records showing that "in June 1983, W.H. Graham was being investigated for raping one of the girls who worked at the `Naked City' on June 24th"; (10) a June 14, 1983, police report of a phone interview with Lori Lite; (11) a June 9, 1984, report; (12) a May 9, 1984, report; (13) a list of questions to be asked of Detective Burke during trial; and (14) undisclosed impeachment evidence regarding witnesses Stevens and Turco.
[13] The fact that the Albach files indicate that W.H. Graham had a car that fit the description of the car that witness Wendy Chancey stated she saw Lisa get into on the day she disappeared does not alter our conclusion. Chancey did not testify at trial and trial counsel was not found ineffective by this Court or the Eleventh Circuit Court of Appeals for failing to call Chancey to testify. See Tompkins, 549 So.2d at 1372; Tompkins, 193 F.3d at 1333. Thus, even if we were to assume that this limited piece of information in the Albach files is favorable to Tompkins, he has failed to demonstrate prejudice.
[14] The report states in pertinent part: SWEENY advised that it was very strange the explanation given surrounding LISA'S disappearance. She advised that she was told that LISA had come home, found WAYNE sitting at the kitchen table with her mother, and asked "what the hell is he doing here!" Her mother, BARBARA, explained that he had no place to go and that she was going to let him move in with them, until he could get on his feet. At that point LISA ran out the back door. According to MAUREEN [SWEENY], it was very unusual for LISA to be outside without her makeup and supposedly she had been outside and then come inside and then gone out again without her makeup. LISA's brother BILLY left the house to go find her and came back to take care of JAMIE.

SWEENY advised that she had been told that WAYNE had gotten up to chase LISA to try and catch her but she was gone, by the time he got outside. SWEENY advised that LISA had left her purse containing her makeup, etc. on the table.
[15] With respect to the Willis statement, the report states in pertinent part: "That is when WAYNE and BARBARA told MIKE the story about the last time they saw LISA. The day they last saw LISA was the day WAYNE moved back into the house on Osborne. She became upset because of the fact that she [sic] was moving back and stormed out of the house."
[16] When the hair samples were tested in 1984, nothing conclusive could be established.
[17] Although the hair samples are no longer available, Tompkins contends that DNA testing is possible on other items found at the grave site, including the skeletal remains, robe, pajamas and miscellaneous debris.
[18] This included dental identification, as well as evidence that the skeletal remains were that of a midteen female, that jewelry identified as Lisa's was found next to the remains, and that the remains were found wrapped in a robe identified as belonging to Lisa.
[19] We do not address Tompkins' requests to the Hillsborough County Sheriff's Office, the Department of Corrections, the Florida Parole Commission and the Board of Executive Clemency in further detail because Tompkins has failed to present any argument as to how the trial court erred in denying the motion to compel with respect to these agencies. See Shere v. State, 742 So.2d 215, 217 n. 6 (Fla. 1999) (stating that where defendant did not present any argument or allege on what grounds trial court erred in denying claims in his postconviction motion, claims were "insufficiently presented for review"); Coolen v. State, 696 So.2d 738, 742 n. 2 (Fla.1997) (explaining that the defendant's "failure to fully brief and argue" specific points on appeal "constitutes a waiver of these claims").
[20] The trial judge at this successive rule 3.850 proceeding was Judge Perry. The trial judge at the trial and for the initial postconviction motion was Judge Coe, who is now deceased.
[21] At the evidentiary hearing, the prosecutor testified that he had no specific recollection of being called by Judge Coe's office. The prosecutor testified that the notes in his office's records indicated that someone from Judge Coe's office called him shortly after the jury returned its recommendation of death. The prosecutor stated that he assumed the call was to prepare the sentencing order because that would not have been unusual for Judge Coe to do.
[22] See Spencer v. State, 615 So.2d 688, 690-91 (Fla.1993) (setting forth exact procedure to be used in sentencing phase proceedings, including requirement that after hearing any additional evidence presented by the State or the defendant, the trial court "recess the proceeding to consider the appropriate sentence"); Grossman v. State, 525 So.2d 833, 841 (Fla. 1988) (holding that "all written orders imposing a death sentence be prepared prior to the oral pronouncement of sentencing for filing concurrent with the pronouncement").
[23] Although we do not condone the ex parte communication in this case, we note that Tompkins was not denied either a neutral, detached judge or an impartial sentencer. Compare Randolph v. State, 853 So.2d 1051, 1064 (Fla.2003) (concluding that the defendant was not denied a neutral and detached judge where the judge's law clerk engaged in an ex parte communication with the prosecutor but there was no evidence that the judge determined that the defendant would receive a death sentence prior to the sentencing proceedings) with Porter v. State, 723 So.2d 191, 197 (Fla.1998) (concluding that the defendant was entitled to a new sentencing based on evidence that the trial judge made up his mind to sentence the defendant to death before the penalty proceedings began).